J-S32018-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.F.M.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.S.A., MOTHER | : | No. 1979 EDA 2016 |

Appeal from the Decree May 26, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No:  CP-51-AP-0000392-2013

BEFORE:   GANTMAN, P.J., STABILE, and FITZGERALD[*], JJ.

MEMORANDUM BY STABILE, J.:                     **FILED JULY 17, 2017**

C.S.A. ("Mother") appeals from the decree entered May 26, 2016 in the Court of Common Pleas of Philadelphia County, which involuntarily terminated her parental rights to her minor daughter, K.F.M.R. ("Child"), born in February 2011.[1]  After careful review, we affirm.

The trial court summarized the relevant factual and procedural history of this matter as follows.

> On January 9, 2012, the Department of Human Services (DHS) received a General Protective Services (GPS) report which alleged that [Child] had been admitted to St. Christopher's Hospital for Children on January 4, 2012.  It was reported

---

[*] Former Justice specially assigned to the Superior Court.

[1] The trial court entered a separate decree that same day, terminating the parental rights of Child's father, C.R. (Father).  Father did not appeal the termination of his parental rights, nor did he file a brief in connection with this appeal.

[Child] had an abscess on her thigh which required hospitalization for surgery. [Child's m]other was initially unavailable to sign the necessary authorization forms for [Child's] surgery. The Philadelphia Police [were] enlisted to locate [Child's m]other. Mother signed the forms for [Child] to receive medical treatment. Mother failed to return to the hospital to visit [Child]. The report was substantiated.

On January 11, 2012, DHS learned that [Child] was ready to be discharged from St. Christopher's Hospital and that Mother failed to return to [the] hospital after signing medical authorization forms for [Child] on January 4, 2012.

On January 11, 2012, DHS visited Mother's home. [Child's] father answered the door and stated Mother was not home. Father stated [Child's] sibling was at the home of her uncle, but refused to give DHS the name or address of [Child's] sibling's uncle. DHS observed that approximately ten people were in the home at the time of the visit and that Father appeared to be under the influence of drugs. Father refused to provide his address or any other information. Father had also given DHS conflicting information regarding his name.

On January 11, 2012, DHS obtained an Order of Protective Custody (OPC) and [Child] and her sibling were placed in a Bethanna foster home.

At the Shelter Care Hearing held on January 13, 2012, the Court lifted the OPC and the temporary commitment to DHS was ordered to stand.

At the Adjudicatory Hearing held on January 23, 2012, the Court discharged the temporary commitment, [and] adjudicated [Child] dependent . . . .

Trial Court Opinion, 1/31/2017, at 1-2.

DHS filed a petition to terminate Mother's parental rights to Child involuntarily on July 3, 2013. However, due to a series of continuances, a termination hearing did not take place until May 26, 2016. Following the hearing, the trial court entered a decree terminating Mother's parental

- 2 -

rights. Mother timely filed a notice of appeal on June 22, 2016, along with a concise statement of errors complained of on appeal.

Mother now raises the following issues for our review.

1. Did Petitioner, DHS, fail to establish by clear and convincing evidence that the mother's [p]arental rights should be terminated where the mother was found, at the hearing [i]mmediately preceding the termination hearing, to be in full compliance with the [p]ermanency plan and only lacked housing[?]

2. Did the trial judge err in terminating the mother's parental rights when she refused to grant Mother's counsel a continuance and opportunity to obtain the proper documentation needed to represent Mother, where the actual termination hearing was the first time counsel had met with and spoken to his client[?]

Mother's Brief at 4 (trial court answers omitted).

We address Mother's claims mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

- 3 -

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a) in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) which provides as follows.[2]

---

[2] In her concise statement of errors complained of on appeal, statement of questions involved, and in the argument section of her brief, Mother challenges the trial court's finding that she failed to comply with her Single Case Plan (SCP) objectives. Mother does not make an effort to challenge the court's finding that terminating her parental rights will serve Child's needs and welfare. Therefore, we conclude that Mother preserved a challenge as to Section 2511(a) only, and that any challenge to Section 2511(b) is

*(Footnote Continued Next Page)*

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

This Court has discussed our analysis pursuant to Section 2511(a)(2) as follows.

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯

waived. *See In re M.Z.T.M.W.*, 2017 WL 2153892, at \*3 (Pa. Super. May 17, 2017) (holding that the appellant waived her challenge to Section 2511(b) by failing to include it in her concise statement and statement of question involved, and that the appellant abandoned any challenge to Section 2511(a)(2) and (5)).

perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, Mother argues that the trial court erred by terminating her parental rights, because she was found to be in full compliance with her permanency plan during a review hearing held on January 9, 2016. Mother's Brief at 7, 10. Mother argues that the only thing she lacked was stable housing. *Id.* Mother contends that her compliance level was changed to moderate during the termination hearing without sufficient explanation, and that the court terminated her parental rights based largely on Mother's failure to produce documentation in support of her testimony. *Id.* at 7, 11.

In its opinion, the trial court found that Child has been placed in foster care for thirty-nine months, and that Mother failed to complete her SCP objectives "in a way that would permit reunification to occur." Trial Court Opinion, 1/31/2017, at 6. The court further found that psychologist, William Russell, Ph.D., conducted a parenting capacity evaluation of Mother, and that Mother failed to address the concerns raised by Dr. Russell. *Id.*

Our review of the record supports the trial court's findings. During the termination hearing, Dr. Russell testified that he completed his parenting capacity evaluation of Mother in April 2015. N.T., 5/26/2016, at 15. Dr. Russell explained that he identified several concerns during his evaluation, but that his biggest concern was Mother's failure to understand how her actions impact Child. *Id.* at 17. Dr. Russell also noted Mother's mental health issues, substance abuse history, history of unstable housing, and her

history of using drug sales and her children's Supplemental Security Income ("SSI") to support herself. *Id.* at 17-18. Dr. Russell summarized his conclusions as follows.

> If you look at the history, the history of the parenting with no income, with unstable housing, with drug sales, with substance abuse. [Mother] has a long standing substance abuse issue. She's told me that she started smoking marijuana when she was about 15 years old and had smoked daily up until recently. She was also using PCP and crack cocaine. So she had a fairly strong substance abuse issue. She had told me at the time of my evaluation she was getting into D[rug] and A[lcohol] treatment. She had had a drug and alcohol evaluation done a couple of months before my report where it was clearly recommended that she needed treatment. All these factors combined do not make a safe environment for children.

*Id.* at 19.

In order to address these concerns, Dr. Russell recommended that Mother obtain a legal source of income, such as employment or SSI, as well as stable housing. *Id.* at 19-20. Dr. Russell further recommended that Mother attend individual mental health therapy, as well as drug and alcohol treatment with frequent urine screens. *Id.* at 20.

The trial court also heard the testimony of Community Umbrella Agency caseworker, Khaliah Moody. Ms. Moody testified that she was assigned to this case in October 2014. *Id.* at 28-29. Mother was incarcerated at that time, as a result of drug convictions and a parole violation, and was not released until December 2015. *Id.* at 29, 33. Ms. Moody explained that Mother was asked to complete a series of SCP objectives, which included obtaining suitable housing, meeting Child's basic

needs by providing food and clothing, participating in a drug and alcohol evaluation, complying with recommendations from the provider, achieving and maintaining recovery from drug and alcohol abuse, "sign[ing] any and all evaluations" for Child "including physical health, vision, hearing and dental problems," complying with Child's Individual Family Service Plan, attending visitation, completing job training, and staying employed. *Id.* at 31-32, 51. Mother also was court-ordered to complete a parenting capacity evaluation and a bonding evaluation with Child. *Id.* at 32.

Concerning Mother's progress in completing these objectives, Ms. Moody rated Mother's compliance as moderate. *Id.* at 37. Ms. Moody testified that Mother completed a parenting capacity evaluation and a bonding evaluation, and attended her visits with Child consistently. *Id.* at 32, 38. However, Ms. Moody reported that Mother failed to address a number of her other objectives, and questioned Mother's ability to provide Child with safety and permanency. *Id.* at 37.

With respect to housing, Ms. Moody testified that Mother was discharged unsuccessfully from the Achieving Reunification Center's housing program on three occasions since October 2014. *Id.* at 32. Ms. Moody explained that Mother currently has housing. *Id.* at 33. Ms. Moody's coworker conducted an assessment of Mother's housing, and deemed it to be appropriate. *Id.* Despite this assessment, Ms. Moody expressed concern that the people Mother resides with have "multiple drug offenses on the record," even though those offenses are "non-prohibitive." *Id.*

Concerning Mother's substance abuse issues, Ms. Moody testified that Mother attends drug and alcohol treatment at Casa de Consejeria. *Id.* at 35. However, Ms. Moody reported that she recently received an e-mail from Mother's counselor, indicating that Mother has not attended treatment since April 21, 2016, more than a month before the hearing, and that Mother had two positive drug screens for which she did not provide a prescription. *Id.* Casa de Consejeria did not inform Ms. Moody what Mother tested positive for, but did inform her that the positive drug screens took place on February 29, 2016, and April 21, 2016. *Id.* Ms. Moody noted that Mother's drugs of choice include benzodiazepines, crack cocaine, PCP, and pills. *Id.* at 34-35.

Although Ms. Moody did not list mental health treatment as an objective for Mother, she expressed concern regarding Mother's mental health status. *Id.* at 34. Ms. Moody explained that Mother attends mental health treatment at Citywide, and that she received a January 2016 progress report regarding Mother's treatment. *Id.* Mother's progress report indicated that Mother "was reporting of hearing voices, snapping out a lot." *Id.* Ms. Moody also received a February 2016 progress report, which indicated that Mother was "seeking more benzos." *Id.*

Thus, the record establishes that Mother remains incapable of parenting Child safely, despite nearly four and a half years of opportunities. Mother continues to test positive for substances for which she does not have a prescription, and resides in a home with other individuals who have a history of drug offenses. Mother also suffers from significant mental health

concerns. It was within the trial court's discretion to conclude that Child's life should no longer be put on hold for the benefit of Mother. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

In her second issue, Mother contends that the trial court erred by failing to grant her counsel's request for a continuance, so that she could gather documentation demonstrating her compliance with her SCP objectives.

> Because a trial court has broad discretion regarding whether a request for continuance should be granted, we will not disturb its decision absent an apparent abuse of that discretion. An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the results of partiality, prejudice, bias, or ill-will.

*In re J.K.*, 825 A.2d 1277, 1280 (Pa. Super. 2003), *appeal denied*, 835 A.2d 710 (Pa. 2003) (citations and quotation marks omitted).

In her brief, Mother explains that she previously was represented by different counsel, and that her current counsel was not appointed until January 2016. Mother's Brief at 12. Mother explains that her counsel attempted to contact her "by letter and by phone" after being appointed, but that he "never got any response. Counsel didn't know if Mother would

actually show up for the hearing." *Id.* As a result, the termination hearing was the first time that counsel had the opportunity to meet with Mother and discuss her case. *Id.* Mother also contends that, since the termination hearing was her counsel's first appearance on her behalf, he should not have been held responsible for any prior continuances. *Id.* at 13.

The trial court explained that it denied Mother's request for a continuance because the case already had been continued repeatedly, and because further continuing the matter would only delay permanency for Child. Trial Court Opinion, 1/31/2017, at 7. The court explained that counsel for Mother received his letter of appointment in February 2016, and that he had three months to meet with Mother and prepare for the termination hearing. *Id.*

We conclude that the trial court did not abuse its discretion. At the outset, Mother appeared at the May 26, 2016 termination hearing, and it is undisputed that she had notice of the proceedings. Moreover, as observed by the court in its opinion, Mother's counsel had months to meet with her and prepare. To the extent Mother was not prepared to proceed with the hearing, Mother's brief establishes that this was her own doing, as she failed to return her counsel's letters and phone calls. Notably, Mother had years to gather documentation for the hearing, as it was continued repeatedly since 2013. The record supports the court's conclusion that permanency for Child should not be delayed any longer, given that Mother had no reasonable justification for not being prepared to proceed with the termination hearing

on May 26, 2016, and given that the case had already been continued numerous times.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to Child, or by denying Mother's request for a continuance. Therefore, we affirm the court's May 26, 2016 decree.

Decree affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/17/2017